844 A.2d 1181

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Steven P. HERMAN.**

**Misc. Docket AG, No. 1, Sept. Term, 2003.**

Court of Appeals of Maryland.

March 18, 2004.

Melvin Hirshman, Bar Counsel and Delores O. Ridgell, Asst. Bar Counsel for the Atty. Grievance Com'n of MD, Petitioner.

James P. Gillece, Jr. (Patrick D. Sheridan, McGuire Woods, LLP, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

On March 13, 2003, the Attorney Grievance Commission, acting through Bar Counsel, filed a petition with this Court for disciplinary or remedial action against Respondent, Steven P. Herman, charging him with violating Maryland Rules of Professional Conduct (MRPC) 1.3 (Diligence),[1] 1.4 (Communication),[2] 1.15 (Safekeeping Property),[3] 8.1 (Bar Admission and

---

1. Rule 1.13 provides:

   A lawyer shall act with reasonable diligence and promptness in representing a client.

2. Rule 1.4 provides:

   (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

   (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

3. Rule 1.15 provides:

   (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

   (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the

Disciplinary Matters),[4] 8.4 (Misconduct),[5] Md.Code (1989, 2000 Replacement Volume), § 10–306 of the Business Occupations and Professions Article,[6] Md.Code (1989, 2000 Replacement Volume), § 10–606(b) of the Business Occupations and Professions Article,[7] Maryland Rule 16–607 (Commingling of funds),[8]

---

client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

**4.** Rule 8.1 provides as follows:

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact; or;

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

**5.** Rule 8.4 provides, in pertinent part, as follows:

It is professional misconduct for a lawyer to:

\* \* \* \*

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

\* \* \* \*

**6.** Md.Code (1989, 2000 Replacement Volume), § 10–306 of the Business Occupations and Professions Article, provides:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

**7.** Md.Code (1989, 2000 Replacement Volume), § 10–606(b) of the Business Occupations and Professions Article, provides:

\* \* \* \*

(b) Attorney trust accounts-A person who willfully violates any provision of Subtitle 3, Part I of this title, except for the requirement that t lawyer deposit trust moneys in an attorney trust account for charitable purposes under section 10–303 of this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

**8.** Rule 16–607 provides:

    a. **General prohibition.** An attorney or law firm may deposit in an

and Maryland Rule 16–609 [9] (Prohibited transactions). Pursuant to Maryland Rules 16–752(a) and 16–757(c), we referred the matter to Judge Robert N. Dugan, of the Circuit Court for Baltimore County to make findings of fact and conclusions of law. Judge Dugan held an evidentiary hearing on September 9, 10, and 11, 2003, and concluded that Respondent violated the following Rules of Professional Conduct: 1.3, 1.4, 1.15, 8.4(b), 8.4(c) and 8.4(d), as well as Maryland Code (1989, 2000 Replacement Volume), §§ 10–306 and 10–606(b) of the Business Occupations and Professions Article and Maryland Rules 16–607 and 16–609. In addition, employing the clear and

---

attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.** 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operation account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

**9.** Rule 16–609 provides:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

convincing evidence standard, Judge Dugan found no mitigating factors present in this case to cause Respondent's misconduct or prevent him from conforming his conduct to the requirements of law and the MRPC.

Respondent filed exceptions to the factual findings and conclusions of law. He recommends that the appropriate sanction for his conduct should be an indefinite suspension from the practice of law, with the right to apply for reinstatement after thirty (30) days. The Petitioner did not file exceptions, but recommends the sanction of disbarment.

## I.

### Findings of Fact

"Based on the admission of facts filed by the Respondent and the evidentiary hearing on September 9, 10, and 11, 2003, the Court makes the following findings of fact:

"1. Respondent was admitted to practice law in New York in 1993 and worked for six months for a small private practice and then opened his own firm and practiced as a sole practitioner from 1993 until 2000 where he handled collections and domestic relations matters.

"2. In 1996, the Respondent was engaged by Bruce Stone, manager of collections, to represent Trans Credit America of Westchester, Inc., (hereafter, "TCA"), a collection agency, to handle small claims. A written contingency fee agreement dated January 26, 1996, was signed by Respondent and Stone (Petitioner's 3, section 6). Under the agreement, Respondent agreed to represent TCA for payment of fees in the amount of twenty percent (20%) of the funds collected for TCA. TCA would also be responsible for the costs involved in the collections.

"3. During times relevant to this matter, Lynn A. Giordano was the president of TCA.

"4. During the period January 1996 through November 1999, the Respondent was referred approximately four hundred fifty (450) account files by TCA.

"5. In the course of representing TCA, the Respondent received payments from third parties on behalf of TCA.

"6. Respondent, in his representation of TCA, would contact the debtors by letter and, if not successful in obtaining payment and, with agreement of TCA, would file suit against the debtors on behalf of TCA and its clients.

"7. Respondent set up a filing system to keep track of his collection cases. He would place a file folder in the first file drawer when the initial demand letter was sent. When he filed suit in the case, Respondent would move the file to the second file drawer. When judgment was entered in the case, he would move the file to the third drawer. Respondent would then move the file to the final drawer when money began to be collected in the case. This complicated system required continued vigilance by the Respondent.

"8. When funds were collected, Respondent placed them in a New York Citibank attorney trust account numbered 43671517. Every four to six weeks, Respondent would take the files from the final drawer, make notations indicating dates and amounts received on the debtor file, and determine what funds were owed to his clients. Respondent would verify the accuracy of his accounting with a computer system before he forwarded funds to clients.

"9. Respondent was authorized by TCA to deposit funds collected on behalf of TCA in the trust account and then remit those funds to TCA minus his fee and any court fees or costs advanced by him. Every four to six weeks during his relationship with TCA, Respondent would make disbursements and send reports to TCA.

"10. From 1996 through 1998, TCA was satisfied with Respondent's services.

"11. In the middle of 1999, the relationship between Respondent and TCA changed. Reports and disbursements to TCA became less frequent. Respondent would generate reports for TCA that indicated the status of certain cases but not always the amount of funds collected or breakdown of fees.

"12. Around this time, Respondent's computer system failed and as a result, Respondent collected funds in a number of TCA cases that did not appear as monies received and were not disbursed to TCA.

"13. Respondent testified that he continued to make notations on the debtor files but he couldn't remember if he made some of the notations contemporaneously with the collection of funds or if he made them at some later date when he attempted to reconcile the TCA files.

"14. Respondent's secretary left around this time and he began to perform the routine administrative tasks himself. As a result, files were not placed in the right drawers and his office fell into disarray.

"15. Respondent never informed TCA of the office management problems he was having in 1999.

"16. Around that same time, communication between Mr. Stone and Respondent became strained. Mr. Stone and Respondent argued about the management of TCA cases for collections under $1,000.00. Respondent wanted to decrease the number of collection cases under $1,000.00 because they were cost-prohibitive, while Mr. Stone maintained that Respondent was obligated to take every case forwarded to him.

"17. Mr. Stone and Respondent also disagreed about the management of the Piermantoni file. In 1997, TCA referred a case to Respondent regarding debt owed by Nelson Piermantoni. When the complaint was filed in this case, Mr. Stone maintained that he served the debtor with a summons on March 27, 1997 and that Respondent failed to diligently pursue this case. The Court believes the testimony of Respondent and finds that he was legitimately concerned about whether or not Mr. Piermantoni had actually been appropriately served. The Court finds that re-service was proper in order for this case to proceed. The Court does not believe the testimony of Mr. Stone that Respondent ever agreed that there was no problem with service.

"18. In the summer of 1999, Respondent telephoned Mr. Stone and informed him that he intended to move his family

to Maryland in spring of 2000 and therefore TCA should obtain new counsel. The Court believes the testimony of Respondent and finds that Mr. Stone was aware of this pending move. The Court does not believe the testimony of Mr. Stone that he was unaware that Respondent was moving until early 2000.

"19. In preparation for his move to Maryland, Respondent wanted to remove himself as attorney of record from TCA cases. The process in New York required an attorney to file a Motion to Strike in each case. The procedure in New York would have required multiple court appearances and would have been very time consuming. With 200 open cases, and without the consent of TCA to withdraw his appearance as counsel, Respondent was placed in a difficult position in order to remove himself as attorney of record. Because of aforesaid difficulty in striking his appearance, he decided to continue to handle the cases.

"20. In November of 1999, TCA's president Lynn Giordano wrote to Respondent requesting information regarding numerous debtor files including a list of cases prepared by Stone. (Petitioner's 3, section 20).

"21. Around December 1999, Respondent wrote a report and sent payment to TCA. (Petitioner's 3, section 18).

"22. After 1999, no new accounts were sent to Respondent from TCA.

"23. In spring of 2000, Respondent moved to Maryland and began to practice law in this State. Respondent brought the TCA files to Maryland and opened on attorney trust account numbered 003931060653 at Bank of America.

"24. Respondent maintained both the Citibank trust account and the Bank of America account through August of 2001.

"25. Respondent made several return trips to New York for court appearances after his move to Maryland.

"26. Respondent continued to have difficulty with his filing system and did not review and account for all TCA files after he moved to Maryland.

"27. No disbursement or report of collections was sent to TCA from December 1999 through January of 2001.

"28. On or about February 14, 2001, the Respondent received a letter from Petitioner that included a copy of a complaint from Lynn A. Giordano. (Petitioner's 3, section 2).

"29. On or about March 2, 2001, Respondent wrote to Petitioner and included a copy of a letter dated January 5, 2001 from Respondent to TCA. Respondent's letter of January 5, 2001, stated that payment was enclosed in the amount of $7,698.46. However, that amount was not received until March of 2001. A check in the amount of $5,698.46 was drawn on the Bank of America account, and a check in the amount of $2,000.00 was drawn on the Citibank account. (Petitioner's 3, Section 4). The March 2, 2001 letter also indicated that Respondent had not turned over the collected funds because he was waiting for TCA to acknowledge that they had received the files he returned and provide a status report at which time he would turn over the funds held in escrow and the matter would be closed. (Petitioner's 3, Section 3, page 2).

"30. On August 20, 2001, Respondent notified Petitioner that a total of $10,245.82 had not been remitted to TCA. (Petitioner's 8, page 5).

"31. The $10,245.82 was owed to TCA as a result of collections made by Respondent prior to November 1999. (Petitioner's 8, page 5).

"32. As of August 20, 2001, according to Respondent's financial records for both bank accounts that were turned over to Petitioner, Respondent was not holding in trust the $10,245.82 described in his letter of that date.

"33. On or about February 15, 2002, Respondent paid TCA $10,245.82. (Petitioner's 8, page 6). Respondent obtained a home equity loan in order to pay the funds remitted to TCA.

"34. Respondent continued to receive funds on behalf of TCA after March 6, 2001 (Petitioner's 8, page 6).

"35. On or about September 4, 2001, Respondent paid TCA $3,411.22. (Petitioner's 8, page 6).

"36. Although Respondent was authorized to take his fee only when making disbursement to TCA, he sent no funds to TCA from December 1, 1999 until March 2001. During that time, Respondent continued to disburse funds from the trust account to himself and his wife (Petitioner's 3, section 51). Petitioner would often use the ATM card, provided to him when he obtained the Citibank account, to withdraw funds from that account.

"37. In March of 2001, Respondent deposited a personal check for $1,000.00 into his attorney trust account with Bank of America in order to obtain new copying equipment for his Maryland office. Respondent then wrote a check from that account to cover the cost because the supplier would only take an attorney's trust check.

"38. All monies due and owing to TCA by Respondent have been paid.

"39. In 1999, Respondent was suffering through personal hardship. Shortly after the birth of their son Max, Respondent's wife had a sequence of three miscarriages. Respondent's relationship with is wife began to deteriorate, and he began to heavily consume alcohol.

"40. In order to spend more time with his family, Respondent began to go to the office late at night after his wife and son had gone to bed in order to do filing and other office work. As his drinking worsened and his marital problems escalated, Respondent began to spend less time at the office at night and fell further behind in his office maintenance. Respondent also cut back on his hours during the day, reserving that time for court appearances and answering telephone calls. As a result, his office was not properly managed with regard to adequately keeping track of his collection files.

"41. Respondent offered the testimony of Dr. Mark Lipton, a clinical psychologist who has been treating Respondent since July 30, 2002. The Court adopts the findings of

Dr. Lipton regarding his discussion of Respondent's psychosocial history and psychological makeup. Dr. Christiane Tellefsen, a forensic psychiatrist, provided similar testimony as a rebuttal witness for the Petitioner. Both experts testified that Respondent abused alcohol, suffered from mild depression, and was having marital problems at times relevant to this proceeding. They disagreed on the issue of intent. However, intent is an ultimate issue of fact for the trier of fact to determine and is not within the proper range of opinion to be offered by these experts. The decision of this Court is not based on the conclusions of either expert witness, but rather arrived at it [sic] independently based on all of the evidence.

"42. The Court finds that Respondent cooperated with the investigation in this matter. He was never directly asked about maintaining other files and he did not deliberately conceal any files or information from Petitioner. Respondent may have been negligent and careless in his handling of files, but he did not interfere with the Petitioner's investigation. Respondent has expressed remorse throughout the grievance process and has paid TCA all funds owed.

### Conclusions of Law

"Petitioner alleges that Respondent violated Maryland Rules of Professional Conduct, (hereinafter MRPC), Rules 1.3, 1.4, 1.15, 8.1, 8.4(b),(c), & (d). The Petitioner also alleges that the Respondent violated Maryland Code Annotated, Bus. Occ. & Prof. Art., § 10–306 and 10–606(b) and Maryland Rules 16–607 and 16–609.

"From 1996 to mid–1999, TCA was satisfied with Respondent's representation. During that time, Respondent was referred nearly 450 collection cases by TCA. Respondent created a unique and rather unorthodox filing system that tracked each case at various points until the case was closed out and disbursements were made. When he received payments, Respondent deposited the funds into an attorney trust account, made a notation on the debtor file, and after

verifying the accounting with a computer system, he would forward the funds to TCA along with reports indicating the status of various cases.

"However, in mid–1999 Respondent's system of maintaining files began to fail. His disbursement of funds and status reports became less frequent even though he continued to receive funds on behalf of TCA. His office and filing fell into disarray, his computer system failed, and he began to endure personal problems.

"From December 1999 to March 2001, Respondent did not report and disburse funds owed to TCA. By doing so, Respondent violated MRPC 1.3 by failing to keep accurate records relating to the trust accounts and failing to promptly account for and disburse funds received on behalf of TCA. The Court believes that Respondent had a difficult and demanding client, but that was all the more reason for him to accurately account for each file and keep his client informed.

"Respondent violated MRPC 1.4 by failing to keep his client reasonably informed about the status of each case and failing to promptly comply with reasonable requests. In November 1999, the president of TCA sent Respondent a letter requesting updated information about many TCA files. Respondent sent a letter and payment in December, but failed to provide information about all files requested. He continued to receive funds on behalf of TCA but made no report of funds received for over a year. By not promptly notifying TCA of funds received on their behalf or providing a full accounting regarding the funds collected, Respondent violated MRPC *1.15(b)*.

"Respondent ignored his improper use of the trust funds. Without accounting for the funds collected on behalf of TCA, he continued to withdraw money from the attorney trust funds through the use of his ATM card, checks made out to himself and his wife, and one check drawn on the funds for the purchase of a copier. Respondent maintains that some of the money he withdrew represented his fees and reimbursements. However, TCA was never provided

an accurate accounting that would indicate a severance of TCA's interest from Respondent's fees and reimbursements. Respondent thereby violated MRPC 1.15(c). After TCA requested an updated accounting in November 1999, Respondent should have been aware that he was not entitled to money that he was spending.

"The Court finds it difficult to accept that Respondent could mistake $20,000.00. the approximate amount repaid to TCA, for his 20% contingency fee plus costs. Respondent would have had to collect approximately $100,000.00 on behalf of TCA to justify such an accounting error. Nothing in the record indicates that the balance in the attorney trust fund was close to that amount. This is further evidence of Respondent's failure to maintain the attorney trust funds in compliance with the law.

"The record does reflect that at some point, the attorney trust funds fell below the amount owed to TCA. On August 20, 2001, Respondent was aware that he owed TCA $10,245.82 for collections made prior to November 1999. However, according to the financial records turned over to Petitioner, Respondent did not have $10,245.82 in trust. This evidence is supported by Respondent's admission that when he realized he did not have sufficient funds to pay the amount owed to TCA, he borrowed $10,245.00 in the form of a home equity loan and deposited the money into his trust account. Additionally, in March of 2001, Respondent deposited a personal check in the amount of $1,000.00 to cover the cost of a copier for his office. Based on these findings, there is clear and convincing evidence that Respondent violated MRPC 1.15, Maryland Rules 16–607 & 16–609.

"The Court finds by clear and convincing evidence that Respondent intentionally and willfully used funds for a purpose other then the purpose authorized by the client in violation of Bus. Occ. & Prof. Article §§ 10–306 and 10–606. He intended at some future date to properly account for all the money owed to TCA, but at some point prior to the move to Maryland, he had to realize that he was not entitled to be spending some of these collections funds. Respondent

intended to borrow the money owed to TCA and at some future date make a full accounting with his client. The November 1999 letter from TCA should have put him on notice that there may have been errors in his accounting system. Even if he didn't have certain files or misplaced them as a result of his filing system, after [being] given notice by TCA, he should have made every effort to search for the files and attempt to reconcile the accounts requested. He also should have ceased spending any funds from his escrow account.

"Furthermore, the Court does not believe Respondent's testimony that he can't remember if he made entries on the debtor files contemporaneously when he collected TCA funds or at a later date. The process of reviewing files after the fact and accounting for every deposit would be such an arduous and difficult task that he would have had to remember it. The only reasonable inference is that the Respondent made the entries contemporaneously with the collection of funds and therefore he knew or should have known that he was in possession of money owed to TCA.

"Despite being aware that his filing system was less than accurate, and that TCA was due money collected, Respondent continued to withdraw money from the trust accounts. Respondent deposited $1,000.00 of personal funds into the Bank of America trust account and borrowed $10,582.00 to cover the deficit in the trust accounts. Respondent's conduct, which resulted in insufficient funds to pay client obligations, is a breach of his fiduciary duty and an invasion of the assets of his client. Although the Court is sympathetic to the fact that Respondent had many small collection cases to account for, the clear and convincing evidence is that the Respondent intentionally misappropriated trust funds in violation of Bus. Occ. & Prof. Article §§ 10–306 and 10–606.

"For the same reasons discussed above, the Court finds that Respondent had the requisite intent to misappropriate funds which reflects adversely on the lawyer's honesty, trustworthiness, and fitness as a lawyer in violation of

MRPC 8.4(b), (c) & (d). Consistent with the Court's finding of facts, Respondent was informed by TCA that his accounting may not be accurate and requested information about several accounts. The Court finds that Respondent engaged in conduct prohibited by MRPC 8.4(b), (c) & (d).

"This Court finds by clear and convincing evidence that the Respondent, Steven P Herman, has violated:

"1. MRPC 1.3 by not acting with reasonable diligence and promptness in representing TCA;

"2. MRPC 1.4 by not keeping TCA informed about the status of the collections matters and promptly complying with reasonable requests for information;

"3. MRPC 1.15 by failing to hold the property, specifically monies collected on behalf of TCA, separately from his own property, by failing to promptly notify TCA of funds received on their behalf and failing to keep the property of TCA separate from the fees owed to him until there was a proper accounting and severance of their interests;

"4. MRPC 8.4(b) by intentionally misappropriating funds which reflects adversely on the lawyer's honesty, trustworthiness and fitness as a lawyer in other respects. No criminal charges have been filed as of this date of this disciplinary procedure and the Court believes that Respondent's actions are proven by clear and convincing evidence but not beyond a reasonable doubt;

"5. MRPC 8.4(c) by engaging in conduct involving dishonesty and misrepresentation;

"6. MRPC 8.4(d) as implicated by his misappropriation of funds;

"7. Md.Code Ann., Bus. Occ. & Prof. Art., Sect. 10–306 and 10–606(b) for willfully using trust money for purposes other than the purpose for which the trust money was entrusted to him;

"8. Maryland Rule 16–607 by commingling funds in an attorney trust account; and

"9. Maryland Rule 16–609 by using funds deposited in an attorney trust account for unauthorized purposes.

"The Court does not believe that Respondent violated MRPC 8.1 For the reasons set forth in finding of fact 44, Respondent did not knowingly make false statements of material fact or fail to disclose information in this disciplinary matter. When he discovered the folders that had been misfiled and that disbursements due TCA had not been forwarded to them, Respondent informed Petitioner of the error and forwarded the funds due TCA."

## II.

### A. Standard of Review

This Court has original jurisdiction over attorney disciplinary matters. *See Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 539, 810 A.2d 457, 474–475 (2002). We accept the hearing judge's findings of fact unless they are clearly erroneous, and we conduct an independent review of the record. *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763–64 (2002). We review the hearing judge's proposed conclusions of law *de novo. See Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

### B. Discussion

First, Respondent asserts that the Petition for Disciplinary or Remedial Action should be dismissed because Bar Counsel failed to comply with the time requirements of Rule 16–731. In addition, Respondent contends Judge Dugan erroneously concluded that Mr. Herman's conduct was either willful or intentional in the use of funds for a purpose other than authorized by the client. Moreover, he posits that any such conclusion is unsupported by the record in this case.

On May 1, 2003, Respondent formally answered the Petition for Disciplinary or Remedial Action and pleaded the affirmative defense that Bar Counsel's failure to comply with Rule 16–731 warranted dismissal of the Petition. Judge Dugan did not specifically address this issue in his findings of fact. However, in exercising our own independent review of the

record, we find no support for the proposition that the Petition should be dismissed. *See Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 97, 797 A.2d 757, 763–64 (2002).

Rule 16–731(d) provides: **Time for Completing Investigation.**

Unless the time is extended by the Commission for good cause, Bar Counsel shall complete an investigation within 90 days after opening the file on the complaint. Upon written request by Bar Counsel establishing good cause for an extension for a specified period, the Commission may grant one or more extensions. The Commission may not grant an extension, at any one time, of more than 60 days unless it finds specific good cause for a longer extension. If an extension exceeding 60 days is granted, Bar Counsel shall provide the Commission with a status report at least every 60 days. For failure to comply with the time requirements of this section, the Commission may take any action appropriate under the circumstances, including dismissal of the complaint and termination of the investigation.(Adopted November 30, 2000, effective July 1, 2001.)

Respondent asserts that subsection (d) requires that, "Bar Counsel shall complete an investigation within 90 days after opening the file on the complaint." In this case, however, disciplinary charges were not filed until November 13, 2002, approximately 21 months after the complaint was lodged. Lynn Giordano, President of TCA filed his complaint with the Commission on February 12, 2001. By letter dated October 9, 2002, counsel for Respondent informed the Attorney Grievance Commission (Commission) that he objected to the delay in the investigation of the complaint.

The Executive Secretary for the Commission responded to the letter dated October 9, 2002, by a letter dated October 10, 2002. In her letter of response, the Executive Secretary stated that "Bar Counsel sought and received extensions of the investigative period from the Attorney Grievance Commission. In light of those extensions, the Statement of Charges in this matter was filed in a timely fashion in accordance with

the Maryland Rules and the Administrative and Procedural Guidelines of the Attorney Grievance Commission." The record is silent as to any further discussion between the Commission and Respondent's counsel on this subject. Likewise, we are uninformed as to any further action taken by Respondent or his counsel concerning this matter.

Although Judge Dugan did not make specific factual findings about the timeliness of the investigatory process, we have said in the past that, "[o]ur hearing courts' duties are to consider all evidence properly submitted in the discipline process. Absent indications that such evidence is not considered, we presume it was considered along with all the other evidence." *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 385, 773 A.2d 463, 468 (2001) (quoting *Attorney Grievance Comm'n v. Miller,* 301 Md. 592, 606–07, 483 A.2d 1281, 1289 (1984)). "Thus, the mere failure to mention a particular fact in its findings, normally is not the equivalent of failing to consider it." *Id.*

In our review of the matter, we emphasize that one of the objectives of the attorney grievance process is efficiency in analyzing complaints and processing charges. The purpose of the time limits contained in subsection (d) is to discourage Bar Counsel from sitting on a disciplinary case when there is other collateral litigation pending. See Judge Wilner's comments made at the open meeting held on November 8, 2000, to adopt Rule 16–731. (If the prosecuting Bar Counsel feels that he or she needs to delay the investigation, he or she must go the Attorney Grievance Commission and make a case for it.)

Additionally, subsection (d) grants to the Commission broad discretion to deal with any failures by Bar Counsel to comply with the time requirements of Rule 16–731. In this case, there is no evidence that Bar Counsel failed to comply with subsection (d). Respondent's inquiry concerning the delay was addressed promptly by the Commission. Moreover, there is no allegation or factual basis to support a finding that the Commission in any way abused its discretion in granting extensions to Bar Counsel to complete its investigation. Like-

wise, there is no allegation or evidence to support a finding that Respondent was prejudiced by the delay.

Furthermore, we have said previously that errors occurring in the preliminary proceedings do not warrant dismissal of the charges. First, the hearing judge, in attorney discipline matters, lacks the authority to dismiss the petition. *Attorney Grievance Comm'n v. Harris*, 310 Md. 197, 200 n. 2, 528 A.2d 895, 896 n. 2 (1987). Second, Rule 16–754(b) provides that "it is not a defense or ground for objection to a petition that procedural defects may have occurred during the disciplinary or remedial proceedings prior to filing of the petition." In *Attorney Grievance Comm'n v. Braskey*, 378 Md. 425, 836 A.2d 605 (2003), we held that the procedural delays involved in that case did not warrant dismissal of the petition. In *Braskey*, the Inquiry Panel hearing was held 312 days after the panel chair had received the file, and the Attorney Grievance Commission filed its disciplinary petition more than three years after the complaint against Braskey had been filed. Relying on *Harris*, 310 Md. at 202, 528 A.2d at 897, we said, "any irregularity in the proceedings before the Inquiry Panel and the Review Board ordinarily will not amount to a denial of due process, as long as the lawyer is given notice and an opportunity to defend in a full and fair hearing following the institution of disciplinary proceedings in this Court." Although we did not specifically comment on the delay of more than three years between the date the Commission received notice of a complaint filed against Braskey and the Commission's filing of a disciplinary petition, we did state that, "[t]here is no statute of limitations in an attorney disciplinary proceeding and mere delay does not warrant dismissal." *Braskey*, 378 Md. at 442, 836 A.2d at 616. "A mere delay in disciplinary proceedings is not a basis for dismissal, absent a showing of prejudice." *Id.* See *Attorney Grievance Comm'n v. Engerman*, 289 Md. 330, 346, 424 A.2d 362, 370 (1981); *Attorney Grievance Comm'n v. Kahn*, 290 Md. 654, 684, 431 A.2d 1336, 1352 (1981). As we stated earlier, there is no claim of prejudice to Respondent. Indeed, his counsel

conceded at oral argument of this case that the proceedings conducted before Judge Dugan were fair.

██ Next, although agreeing with Judge Dugan's factual findings, Respondent asks that we interpret those findings to mean that Mr. Herman was "negligent and careless in his handling of files" and that "there is no clear and convincing evidence on this record to support a finding of dishonesty, fraud, deceit, or misrepresentation on Respondent's part." Furthermore, Respondent contends, "there is no clear and convincing evidence on this record to support a finding that Mr. Herman intended to misappropriate and misuse TCA funds, this Court should overrule Judge Dugan's conclusions of law and hold that Respondent's violations resulted from negligent rather than intentional misconduct."

Judge Dugan found that around the middle of 1999, Respondent's computer system failed and, as a result, Respondent collected funds in a number of TCA cases that were not recorded as monies received and were not disbursed to TCA. In addition, the record shows that around this time Respondent's secretary left his employment and Respondent began to perform routine administrative tasks, resulting in files being placed in the wrong drawers and the office falling into disarray. Respondent never informed TCA of the office management problems. Judge Dugan also found that even though Respondent continued to have difficulty with his filing system, he did not review and account for all TCA files. In addition, Respondent neither made disbursements nor reported collections to TCA from December 1999 through January 2001.

Most revealing is the fact that on August 20, 2001, Respondent informed Petitioner that the $10,245.82 owed to TCA, as a result of collections made prior to November 1999, had not been remitted to TCA. Based upon Respondent's financial records, as of August 20, 2001, the $10, 245.82 belonging to TCA was not in Respondent's escrow account. On February 15, 2002, Respondent used his own funds to reimburse TCA. In addition, as other monies belonging to TCA were deposited in escrow, Respondent continued to disburse funds from the

trust account to himself and his wife without making any disbursements to TCA.

In our view, these facts clearly support the conclusion that Respondent intentionally misappropriated funds that were due TCA. After Respondent's computer system failed, he resorted to abusing alcohol and suffered family problems and depression. These factors, however, did not cause his intentional disbursement of TCA's funds to himself and his wife nor do they mitigate his actions. In our view, Judge Dugan's conclusions of law were consistent with the facts as he found them to be.

### III.  Sanction

The appropriate sanction for a violation of the MRPC depends on the facts and circumstances of each case, including consideration of any mitigating factors. *Attorney Grievance Comm'n v. Awuah,* 374 Md. 505, 526, 823 A.2d 651, 663 (2003). The principles we consider in arriving at the appropriate sanction are well established. *Attorney Grievance Comm'n v. McClain,* 373 Md. 196, 211, 817 A.2d 218, 227 (2003). Primarily, we seek "to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal Profession." *Awuah,* 374 Md. at 526, 823 A.2d at 663 (quoting *Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998)). To achieve the goal of protecting the public, we impose a sanction that is "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id.* (quoting *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997)).

"Absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment." *Attorney Grievance Comm'n v. Vlahos,* 369 Md. 183, 186, 798 A.2d 555, 556 (2002). In other words, when intentional misappropriation of funds is found, which is the nature of this case,

absent compelling circumstances, disbarment follows as a matter of course.

Judge Dugan found that Respondent's personal problems, administrative difficulties and his "negligent and careless handling of files" did not cause his misconduct or prevent him from conforming his conduct to the requirements of law and the MRPC. Specifically, the hearing judge found that none of "the mitigating circumstances of this case caused Respondent not to conform his conduct with the law and the MRPC."

Respondent assails Judge Dugan's conclusions of law and advances indefinite suspension as the appropriate sanction in this matter on the grounds that: (a) the case against Mr. Herman rests upon circumstantial evidence; (b) Mr. Herman testified that he did not intend to steal any client funds; (c) Mr. Herman did not systematically do anything; (d) Mr. Herman made restitution to TCA; and (e) he is remorseful. Respondent's arguments are unpersuasive.

Here the evidence shows that Respondent intentionally and willfully used funds for a purpose other than the purpose authorized by the client. The evidence was clear and convincing that Respondent intentionally misappropriated the trust funds, and this conduct reflected on his honesty, trustworthiness, and fitness as a lawyer. Judge Dugan found that Respondent, "engaged in criminal conduct adversely reflecting on his honesty, trustworthiness or fitness to practice in other respects, in violation of MRPC; engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of MRPC 8.4(c); and engaged in conduct prejudicial to the administration of justice, in violation of MRPC 8.4(d). This same conduct violated Md.Code (1989, 2000 Replacement Volume), §§ 10–306 and 10–606 of the Business Occupations and Professions Article and Maryland Rules 16–606 and 16–607."

Furthermore, Judge Dugan found that Respondent possessed the requisite intent to misappropriate funds from his escrow account. Mr. Herman knew, or should have known, that there were errors in his accounting system. Therefore, he should have made efforts to search the files and attempt to

reconcile the accounts TCA requested. At the very least, he should have ceased spending funds from the trust account. With knowledge that his filing system was inaccurate, and that TCA was owed money collected, Respondent continued to withdraw funds from the trust accounts. As pointed out by Judge Dugan, "Respondent's conduct, which resulted in insufficient funds to pay client obligations, is a breach of his fiduciary duty and an invasion of the assets of his client."

On August 21, 2001, Respondent was aware that he owed TCA $10, 245.82 for collections made prior to November 1999. He did not have sufficient funds in the trust account and borrowed $10, 245.00; and, in turn, deposited those borrowed funds into the trust account. The commingling of assets is a violation of MRPC 1.15 and of Maryland Rules 16–607 & 16–609. The misappropriation of client assets is a violation of Md.Code (1989, 2000 Replacement Volume), §§ 10–306 and 10–606(b) of the Business Occupations and Professions Article. In addition, disbursement of client assets that Respondent knew he was not entitled to spend, constitutes a misappropriation reflecting adversely on the lawyer's honesty, trustworthiness, and fitness in violation of MRPC 8.4(b), (c) and (d). All of the wrongdoing was compounded when TCA asked Respondent for an accounting and no accounting was forthcoming, supporting further violations of 8.4(b), (c) and (d).

In *Attorney Grievance Comm'n. v. Vlahos,* 369 Md. 183, 798 A.2d 555 (2002), we held that disbarment was the appropriate sanction for an attorney who regularly misappropriated cash and checks belonging to the law firm by which he was employed. *Id.* When confronted by Bar Counsel, the attorney lied in an attempt to explain his dishonest conduct, and the attorney did not present any mitigating circumstances to justify a lesser sanction. *Id.* We pointed out in *Vlahos* that it was immaterial that the respondent stole from his employer and not from clients, and because the "misconduct involves misappropriation of funds, disbarment follows as a matter of course." *Vlahos,* 369 Md. at 187, 798 A.2d at 557.

In *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 773 A.2d 463 (2001), we held that disbarment was the appropriate sanction when an attorney, over a period of time, while working outside of the profession of law, misappropriated $3,880.67 from her employer for her own use. In that case we emphasized that "disbarment ordinarily should be the sanction for intentional dishonest conduct." *Vanderlinde,* 364 Md. at 418, 773 A.2d at 488. Judge Cathell, writing for this Court, further clarified that this "Court does not consider the case of *Attorney Grievance v. Hess,* 352 Md. 438, 722 A.2d 905 (1999) (involving billing fraud and the hearing judge's finding as 'mitigating factors that Hess had been under stress from a large workload during the Maryland savings and loan crisis; that his firm was a 'tenuous financial situation'; that Hess was in the process of a bitter and embarrassing divorce; that he had shown remorse, and that there was no suggestion of a likelihood of previous or similar conduct')" or the pre-*Kenney*[10] cases to be authority for an argument for leniency in attorney disciplinary matters involving intentionally dishonest conduct. Furthermore, in *Vanderlinde,* we expounded upon *Kenney* and held that, "in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC." *Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485. In other words, unless that standard is met, the impairment alleged is

---

**10.** In *Attorney Grievance Comm'n v. Kenney,* 339 Md. 578, 664 A.2d 854 (1995), the hearing judge found as a fact that Kenney's alcoholism was, "to a substantial extent, 'the responsible, the precipitating, the root cause' of the Respondent's misappropriation of trust funds." We imposed an indefinite suspension instead of disbarment. Because of our duty to protect the public we cautioned members of the bar that absent truly compelling circumstances, alcoholism should not provide mitigation where an attorney has been found to have committed a violation which would ordinarily warrant disbarment.

not "the root cause" of the misconduct. *Vanderlinde,* 364 Md. at 418–19, 773 A.2d at 488. With this precedent in mind, we turn to the facts of this case and Respondent's plea for a lesser sanction.

Judge Dugan found, by clear and convincing evidence, that Respondent misappropriated funds. He did not find any mitigating factors. Respondent even concedes that his "personal crises and professional difficulties are not mitigating circumstances," but instead he suggests that they are offered as proof of his lack of intent to steal client funds. Unfortunately, Respondent overlooks the fact that the hearing judge did not believe Respondent's explanation for taking his client's money and failing to account to the client the status of the escrow account. In other words, Mr. Herman presented no ethical or legal justification for his conduct. We have said, however, that "intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character." *Id.* We reject Respondent's arguments, overrule his exceptions, and finding no extenuating circumstances, impose disbarment as a matter of course.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST STEVEN P. HERMAN.*