60 A.3d 456

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Paul Winston GARDNER, II.

Misc. Docket AG No. 74, Sept. Term, 2011.

Court of Appeals of Maryland.

Feb. 11, 2013.

Raymond A. Hein, Deputy Bar Counsel (Glenn M. Grossman, Bar Counsel (Attorney Grievance Commission of Maryland)), for petitioner.

Paul Winston Gardner, II, pro se, for respondent.

Argued before HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, DALE R. CATHELL (Retired, specially assigned) JJ.

DALE R. CATHELL (Retired, specially assigned) J.

The Attorney Grievance Commission of Maryland ("AGC"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action in which it asserted that Paul Winston Gardner, II, Respondent, violated certain of the Maryland Lawyer's Rules of Professional Conduct in respect to several client

matters.[1] Bar Counsel alleged that Gardner violated the provisions of the following rules: 16–701(i),[2] 1.1,[3] 1.3.,[4] 1.4,[5] 1.5,[6] 1.7,[7] 1.15,[8] 1.16,[9] 5.4,[10] 8.4(a),(c), & (d),[11] Maryland Rule 16–606.1(a)(1)(2) & (3),[12] 16–609(a), (b), & (c).[13]

---

1. Where feasible, we shall only quote that portion of a particular rule that relates to the specific allegations of Bar Counsel's Petition and the facts as we discern them and shall not generally include the title, if any, of such rule. When in this opinion we refer to the *Maryland Lawyer's Rules of Professional Conduct,* we shall merely refer to the number of the rule—1.1, 1.5, etc. When we are referring to Chapter 600, *Attorney Trust Accounts* of Title 16 of the *Maryland Rules,* we will preface the particular rule with the number 16,—16–606.1, etc.

2. " . . . . The term [professional misconduct] includes the knowing failure to respond to a request for information authorized by this Chapter without asserting, in writing, a privilege or other basis for such failure."

3. "A lawyer shall provide competent representation to a client. . . . "

4. "A lawyer shall act with reasonable diligence and promptness in representing a client."

5. "(a) A lawyer shall:
    (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.01(f), is required by these Rules;
    (2) keep the client reasonably informed about the status of the matter;
    (3) promptly comply with reasonable requests for information; . . .
    (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

6. "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. . . . "

7. "(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:
    (1) the representation of one client will be directly adverse to another client; . . .
    . . .
    (b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:
    . . .
    (4) each affected client gives informed consent, confirmed in writing."

8. "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from

the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the rules of that Chapter. . . . Complete records of the account funds and of other property shall be kept by the lawyer and preserved for a period of at least five years. . . .

. . .

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

(d). . . . Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client . . ., shall render promptly a full accounting regarding such property."

9.  "(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1) the representation will result in violation of the Maryland Lawyers' Rules of Professional Conduct or other law;

. . .

(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client.

. . .

(7) other good cause for withdrawal exists.

. . .

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. . . ."

10. "(a) A lawyer or law firm shall not share legal fees with a nonlawyer, . . ."

11. "It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;"

12. "(a) . . . The following records shall be created and maintained for the receipt and disbursements of funds of clients . . .

Bar Counsel's Petition is organized in three sections: "A. BC Docket No. 2010–242–4–8 Complainant: Bar Counsel," "B. BC Docket No. 2010–399–4–8 Complainant: Steve Kang," and "C. BC Docket No. 2011–119–4–8 Complainant: Vivian McGhee Boyd." [14] The genesis of this matter began when Bar Counsel was notified by a financial institution that the Respondent's trust account had been overdrawn which resulted in Bar Counsel conducting an investigation as to the activity in Respondent's trust account. That investigation apparently led to the complaints in respect to Respondent's representation of Mr. Kang and Ms. Boyd.

Pursuant to Md. Rule 16–752, the Court referred the matter to Judge Jeannie J. Hong of the Circuit Court for Baltimore City for a hearing. Judge Hong conducted a hearing and filed her findings of fact and conclusions of law on September 28, 2012.

The Respondent takes exception to some of the hearing judge's findings of fact. Recently in *Attorney Grievance Commission v. Zimmerman,* 428 Md. 119, 134, 50 A.3d 1205, 1214 (2012), the Court noted, in part quoting from *Att'y*

. . .
(1) "... An identification of all attorney trust accounts maintained,
. . .
(2) ... A record for each account that chronologically shows all deposits and disbursements....
. . .
(3) ... A record for each client matter in which the attorney receives funds, ..."

**13.** "a. ... An attorney or law firm may not borrow or pledge any funds required by the Rules in this chapter to be deposited in an attorney trust account, ..., or use any funds for any unauthorized purpose.

b. .... An instrument drawn on an attorney trust account may not be drawn payable to cash or bearer, and no cash withdrawal may be made from an automated teller machine or by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.

c. .... No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate."

**14.** Ms. Boyd is now deceased.

*Grievance Commission v. London,* 427 Md. 328, 343, 47 A.3d 986, 995 (2012), that:

"In attorney discipline proceedings, this Court has original and complete jurisdiction and conducts an independent review of the record. We accept hearing judge's findings of fact unless we determine that they are clearly erroneous. That deference is appropriate because the hearing judge is in a position to assess the demeanor-based credibility of the witnesses. In that regard, the hearing judge is permitted to pick and choose which evidence to rely upon from a conflicting array when determining findings of fact.

We review de novo the hearing judge's proposed conclusions of law. In other words the ultimate determination . . . as to an attorney's misconduct is reserved for this Court. In that regard, we examine the record to ascertain whether there was sufficient evidence to support the hearing judge's legal conclusions, by a clear and convincing standard of proof."

. . .

In sum, the hearing judge's findings are reasonable, considering the evidence and the judge's role in assessing the credibility of witnesses and choosing which pieces of evidence to rely on during fact-finding. . . .

We have read the transcripts of testimony that took place over three days comprising almost 700 pages, and have reviewed hundreds of pages of various documents. The testimony of Mr. Kang comprised over 200 pages during two days of the proceedings. Respondent's testimony consumed at least 170 pages of the transcripts. Upon our independent review of the record, we agree that it is established by clear and convincing evidence that the Respondent violated the above provisions of these rules.

Judge Hong's fact findings include the following:

## "A. Complaintant: Bar Counsel

On four occasions between May 28, 2009 and September 9, 2009. Respondent paid his Office Manager, Rosalind

Tyner, a total of $700.00 in administration fees with checks drawn on his attorney trust account. . . .

. . .

Respondent paid this money to Ms. Tyner for her work on personal injury cases. Ms. Tyner was not a lawyer, and Respondent's fee agreements did not state that he would be sharing legal fees with Ms. Tyner from the portion of the settlement proceeds that were collected as attorney's fees.

On September 28, 2009, Leonard J. Seigel, Esquire presented check number 1171 drawn on Respondent's trust account in the amount of $2,500.00 for payment, and the account did not contain sufficient funds at the time of presentation. . . . This caused an overdraft in Respondent's trust account which left a [negative] balance of -$922.17. . . . Accordingly a notification was sent to Bar Counsel by the bank alerting them of the overdraft. . . .

On September 30, 2009, Respondent deposited a Personal Injury Protection (PIP) check on behalf of his client, Angello Gordon, in the amount of $2,500.00 which left a balance of $1,577.83 in Respondent's trust account. [$1,577.83 plus the overdraft amount of $922.17 equals the $2,500.00 amount of the PIP check.] . . . Respondent made two cash withdrawals from his trust account which occurred on June 29, 2009 for $400.00 and on October 2, 2009 for $1550.00. . . . The October 2 withdrawal left a balance of $27.83. Respondent failed to keep Mr. Gordon's funds in trust prior to disbursement."

In his Answer to Bar Counsel's Petition for Disciplinary or Remedial Action, the Respondent acknowledged the misconduct alleged in Section A of the petition. He also acknowledged the same during his testimony and took no exception to this finding. Maryland Rule 16–759(b)(2) provides: "If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any."

### B. COMPLAINANT: STEVE KANG

Judge Hong's findings in respect to the Kang matter are as follows:

"*I. Mingshu Li Matter*

....Acting as an agent [of Mrs. Li], Mr. Kang hired Respondent to prepare and file a non-immigrant visa application [for Mrs. Li's husband, Jin Shifeng]. This was the first instance in which Respondent filed immigration paperwork with the office of United States Citizenship and Immigration Services (hereinafter 'USCIS') on behalf of a client.

Although not listed on any invoice, Mr. Kang testified that Respondent charged $3,500 for the completion and filing of a L1/L2 visa application for Mrs. Li. The U.S. Department of State denied the application on June 19, 2006 because the application did not contain sufficient information about the company, and because there was nothing to show the money was committed to be invested in the company.... The application itself also incorrectly listed Jin Shifeng's gender as being female.

Respondent waited until September 15, 2006 to send an email to Mrs. Li, in care of Mr. Kang, to inform her that the funds had to be invested in the Yanbian Company prior to refilling the visa petition, and that Respondent would re-file the petition once the money was transferred.... On September 14, 2006, Mrs. Li transferred $135,185.00 into the account Mr. Kang opened at Bank of America for the Yanbian Company.... Respondent never refiled the visa application.... On February 21, 2007, Respondent drafted a letter to Mrs. Li suggesting terms for cancellation of the contract between the Yanbian Company and Kentrexs Ent., Ltd, and offered Mrs. Li a refund of $100,000 without first consulting Mr. Kang.

Gary Maslin, Esquire [an attorney retained by Mrs. Li apparently in respect to her efforts to recover the money] sent a demand letter on April 18, 2007 to Respondent on behalf of Mrs. Li calling for a return of money owed to her, and put Respondent on notice that his representation of

both Mr. Kang and Mrs. Li may be a conflict of interest.... Respondent mailed Mr. Maslin a reply on May 4, 2007 stating that he did not have a retainer agreement for Jin Shifeng, that the visa application was properly prepared based on information given to him by Mrs. Li and Mr. Kang, and that Mr. Kang said he would pay Mrs. Li whatever funds were owed to her.... Mr. Kang never returned the money, and Mrs. Li filed a lawsuit on October 31, 2007 ... against Mr. Kang and Bank of America.... Respondent never mentioned to Mr. Kang the existence of a potential conflict stemming from his preparation of the visa application until December, 2008. Mr. Kang was shocked when he found out Respondent would not be representing him in the lawsuit.

. . .

On November 28, 2008, Ms. Griffith [an attorney that had some type of working relationship with Respondent] met Mr. Kang for the first time to discuss the impending trial.... This meeting lasted for approximately forty minutes. Mr. Kang signed an agreement on December 1, 2008 [the date of the scheduled Li/Kang trial] retaining Ms. Griffith as trial counsel, and Ms. Griffith entered her appearance on this date.... This agreement provided that Mr. Kang would pay Ms. Griffith a $5,000.00 fee for representation at trial.... Counsel for Mrs. Li filed a Motion to Strike/Disqualify Opposing Counsel on December 1, 2008 ... Respondent then voluntarily withdrew from his representation of Mr. Kang....

Up until the time Respondent withdrew his appearance, Ms. Griffith expected that Respondent would be assisting her with the case as he was familiar with the relevant facts. Ms. Griffith, ... made a request for a postponement on December 2, 2008 [during the trial] which was denied. Ms. Griffith was not prepared to try the case on her own, and did not put forth any witnesses to testify or introduce any evidence in Mr. Kang's defense. Neither Respondent nor Ms. Griffith explained the significance of punitive damages to Mr. Kang until the day of trial. On December 3, 2008,

the court entered judgment against Mr. Kang in the amount of $150,200.00 in compensatory damages and $50,000.00 in punitive damages...."

The Respondent did not except to these findings of fact.

"*II.   Respondent's Retainer Agreement with Steve Kang*

Respondent and Mr. Kang only executed one retainer agreement .... While the visa application and [the] litigation were pending, Mr. Kang hired Respondent for his assistance in a number of legal matters.   There was no separate retainer agreement executed by Respondent and Mr. Kang for any of these matters and Respondent never communicated the basis of the fees collected for these matters."

Respondent did not except to these findings of fact.

"*III.   The Biddle Street/OK Liquors Matter*

On or about May 9, 2007, Mr. Kang engaged Respondent on behalf of himself and Choe and Choe [15] to find the owners of lots of [on] the 2300 block of East Biddle Street and purchase the properties to develop a strip shopping center.... Work in this matter consisted largely of mailing letters to a number of elected officials seeking whatever information he could find about the property owners and the city's plans for the area.... Mr. Kang never received copies of these letters despite notations indicating that he was sent carbon copies of each...."

Respondent took no exception to this finding of fact.

"*IV.   The 'Night Owl' Matter*

Mr. Kang enlisted Respondent on September 10, 2007 to assist with the sale of property in Baltimore City.... Mr. Kang testified that he spoke with Donna Wade, an employee at Respondent's law firm, several times about the Night Owl matter.   In his testimony, Respondent fervently denied ever employing anyone, or even knowing anyone, named Donna

---

**15.** The record in this case sometimes identifies Choe as Cho.

Wade. In Respondent's bills for the Night Owl matter, the 'Donna Wade Issue' is mentioned nine times...."

Respondent made no exception to this finding of fact.

"*V.   Tony Kim and Youngsuk MacPherson*

On April 9, 2008, Krystle Myers, Respondent's senior law clerk, traveled with Mr. Kang to Virginia to meet with new prospective clients, Tony Kim and Youngsuk MacPherson. Mr. Kang referred Mr. Kim and Mrs. MacPherson to Respondent about potentially representing their business, Kim & MacPherson, LLC. Mr. Kim and Mrs. MacPherson ultimately declined Respondent's representation.   Respondent billed Mr. Kang $1,490.00 for trips to Virginia, various communications and memorandums, and researching co-counsel...."

Respondent took no exception to this finding of fact.

"*VI.   The Jim Peang Lawsuit*

On August 13, 2008, Cho and Choe retained Respondent, through Steve Kang acting as an agent, to file a lawsuit against Jim Peang when a dispute arose regarding misappropriated funds.   Mr. Kang never saw any of the work Respondent claims to have completed on this matter.   Jim Peang could not be located for service of process."

Respondent took no exception to this finding of fact.

"*VII.   The Federal Liquors Matter*

On or about September 23, 2008, Mr. Kang retained Respondent to represent him in a liquor license transfer. Respondent drafted numerous letters to various community associations introducing his clients and encouraging them to come forward with any concerns they had.... Respondent successfully transferred the license, but the process took approximately one year.   He charged Mr. Kang a flat rate of $3,500.00 for this matter."

Respondent took no exception to this finding of fact.

"*VIII.   The Canton Café Matter*

Respondent's billing invoices indicate that on October 28, 2008, Mr. Kang retained Respondent to represent INK

Builders, Inc., Mr. Kang's contracting company, against Dujamae LLC (hereinafter 'Dujamae').... Dujamae hired INK Builders to build a salad bar and café in the First Mariner Building in Baltimore, Maryland. Dujamae fired Mr. Kang and INK Builders after they had completed approximately forty percent of the work. Mr. Kang was never paid for the work completed.

Respondent filed a mechanic's lien on behalf of Mr. Kang, captioned as *Steve Kang v. Dujamae, LLC,* in the Circuit Court for Baltimore City on January 6, 2009.... After filing the lien, Respondent did not perform any work in this [mechanic's lien] case, and *Kang v. Dujamae, LLC* was dismissed due to lack of prosecution on February 16, 2010.... Mr Kang was never shown the legal work Respondent claimed he completed, and only became aware that Respondent had filed a mechanic's lien after being told by his new attorney, Dave Clinnon."

Although Respondent excepts to the proposed conclusion of law on this matter, *infra,* he made no exception to this finding of fact that supports the hearing judge's conclusion.

"*IX. The Essex Property Matter*

Respondent was also retained by Mr. Kang to assist with business matters related to a shopping center renovation in Essex, Maryland. The land was burdened by a high property tax bill, and Respondent was hired to file for a hearing to lower the tax liability. For this matter, Respondent charged Mr. Kang $9,000.00."

Respondent took no exception to this finding of fact.

"*X. Respondents Billing of Steve Kang's Legal Matters*

Respondent did not send regular invoices for any of Mr. Kang's legal matters. At one point, Mr. Kang requested itemized bills that detailed the work performed and the fees charged. Mr Kang then received a single billing statement encompassing all of his matters with Respondent. Respondent and Mr. Kang met on four separate occasions in an effort to generate accurate invoices. After each meeting, Respondent would provide a new set of bills to Mr. Kang.

.... Mr. Kang could not comprehend the bills provided to him because line items for work on various matters were still being billed to the wrong invoice. Respondent did not maintain a separate record of fee payments for each matter, and routinely listed fee payments on invoices without designating the matter for which the [requested] payment was made.... Notwithstanding Respondent's admission that all of the bills contain inaccuracies, he contends that Mr. Kang still owes him approximately $13,000.00 in unpaid legal fees."

Respondent attempts to except to this finding, but does so while admitting the bills were inaccurate ("While Respondent admitted that the ... designation of the billing of certain matters was inaccurate,") arguing only that no evidence had been introduced to demonstrate that he had overbilled Mr. Kang. The finding did not allege overbilling but a pattern of confusing billing that remains unresolved. This exception is overruled.

### C.  COMPLAINANT: VIVIAN BOYD

Judge Hong's findings of fact on this matter are as follows:

"On February 2, 2010, Respondent was retained by Vivian McGhee Boyd (hereinafter 'Ms. Boyd') and her son Christopher 'AG' [16]Holden, for an 'entertainment matter.... Respondent was to earn $250.00 per hour to be billed monthly.... On February 2, 2010, Respondent also received a $5000.00 payment from Ms. Boyd into his trust account as a retainer for legal services....

AG was an aspiring rapper who had a promising career in the music industry. Prior to Respondent's involvement in this matter, Capital Records, Warner Brothers, and Universal had expressed significant interest in signing AG to their

---

**16.** Aaron Garnell Garner was a principal in the "AG" company. Although his initials are A.G., he is not the rapper "AG." The rapper "AG" is Aaron's brother, Christopher Holden. Mrs. Boyd was their mother. "AG", the rapper artist, did not testify at the hearing. Aaron Garnell Garner did testify.

label. Each label had put forth a bid of at least $500,000.00....

Respondent excepts to this finding saying, that "no tangible evidence of such offers was put forth at trial, ..." Interestingly, Petitioner agrees with Respondent. They are both incorrect. Aaron Garnell Garner, speaking for the company known as AG and speaking about his brother, Christopher Holden, whose rap name was "AG," testified as follows:

"Answer: We had three labels that were interested in our company as AG which is Universal Records, and Warner Brothers and Capital Records ... Warner Brothers, Universal and Capital Records was very interested in my brother AG, which is the artist AG.... Christopher Holden is my brother also my artist too.

Question: And how much had Universal or Capital initially offer[ed] Mr. Holden [the artist "AG"]?

Answer: Well they, Warner Brothers offered us five hundred thousand dollars. Universal offered us six hundred [thousand] dollars. Capital was still debating.... It's a bidding war.... Capital came in ... and they offered the same amount that Universal did, which is six hundred thousand also too ... We just needed that ... album for Rick Ross to be finished.... Since that didn't happen we lost all of that." [17]

It is obvious to this Court that there was sufficient clear and convincing evidence to support this finding by Judge Hong. Accordingly, the exception is overruled. Judge Hong also found:

---

17. On page 46 of the transcript of the August 16 afternoon session, after Aaron had testified as above, Respondent testified: "Mr. [Aaron] Garner testified that Universal offered $600,000, Warner offered $500,000 in a bidding war. And I believe another record [company], Capital, offered another $500,000 in a bidding war. Vivian [Ms. Boyd] never mentioned that. And I have yet to see any evidence to that." Aaron had already testified. His testimony was evidence. The fact that Respondent did not know about it is of little significance. Other than his testimony questioning the evidence presented, Respondent presented absolutely no evidence, as opposed to mere speculation, contrary to the evidence on this point adduced from Aaron.

".... Respondent presented himself as an effective entertainment lawyer with connections in the music industry that could make AG's dreams come true. Meanwhile, Mrs. Boyd was dying of cancer.

Respondent made seven (7) cash withdrawals in February 2010 totaling $3,650.00, and paid a Verizon bill on February 22, 2010 in the amount of $552.62 using funds from his trust account.... As of February 23, 2010, Respondent's invoices indicate he had only worked two billable hours on behalf of AG.... Accordingly, his trust account should have had a balance of $4,500.00, but the balance of Respondent's trust account on that date was $97.38....

.... Respondent then suggested to Ms. Boyd that they contact Michael 'Blue' Williams, a manager in the recording industry, to help facilitate contact with Rick Ross [apparently an established rap singer]. Mr. Williams quoted a price of $25,000.00 [to Respondent] to get Rick Ross to perform a song with AG. Ms. Boyd, using her home as collateral, secured a loan in the amount of $25,000.00 from investors in Washington[State]. On March 29, 2010, Ms. Boyd deposited $9,000.00 into Respondent's trust account.... She made another deposit into Respondent's trust account in the amount of $16,000.00 on March 30, 2010....

On April 2, 2010, Mr. Williams emailed Respondent requesting a wire transfer 'for Rick Ross and DJ Khalid' in the amount of $12,500.00 into a Chase Bank account held by Family Tree Entertainment.... Respondent never made a wire transfer. On April 2, 2010, Respondent made a $12,5000.00 cash withdrawal in Baltimore [from the trust account]. He traveled by train to New York City. Mr. Williams picked him up at the train station, and Respondent handed the money to him in the car. A $12,500.00 cash withdrawal was posted to Respondent's trust account on April 5, 2010.... No contract or agreement memorializing that the funds were transferred for the purpose of securing the appearance of Rick Ross to record a commercial quality track was executed.... The parties never signed a contract or recording agreement with Rick Ross. Mr. Williams

ceased communication with Respondent sometime in June 2010, and Respondent claimed he had not spoken with Mr. Williams since that time. However, Respondent admitted to giving Blue Williams $1,000.00 from the trust account after he terminated his representation in July 2010. Respondent reimbursed himself for the transaction on December 10, 2010 using funds from the trust account. . . . Neither Ms. Boyd nor AG authorized the payment, and Respondent could not state why he made that particular disbursement to Mr. Williams.

On May 24, 2010, Respondent spoke with Ms. Boyd about the Essence Music Festival in New Orleans, Louisiana that would feature an author known as 'Zane'. . . . Respondent asked Ms. Boyd if she wished to sponsor the event for $2,500.00. . . . Ms. Boyd agreed to the sponsorship. . . . Respondent withdrew a check in the amount of $2,500.00 from his trust account and deposited the check into his operating account on May 27, 2010. . . . Respondent could not produce any receipt or other documentation proving he made the payment for the sponsorship. . . .

. . . . On June 24, 2010, Respondent issued check number 1696 drawn on his trust account payable to Gardner Law Group in the amount of $399.40. . . . The memo line on the check indicated that the purpose was for, 'Paul's Airfare for Client Event New Orleans 7/2/10 (Vivian McGee).' . . . Respondent did not use the airline ticket, and never refunded the money from the disbursement back into his trust account after the event was canceled.

The balance in Respondent's trust account at the end of June 2010 was $9,022.98. . . . Out of the $30,000.00 given to Respondent, he should have been holding $9,630.00 in his trust account in light of an email from Ms. Tyner detailing expenses for the representation of AG.

. . .

Respondent disbursed a $1,500.00 check from his trust account, made payable to the Garner Law Group, on July 6, 2010. . . . The memo line notes that the check was for 'Vivian Boyd McGee—weekend outing + plane tickets.'. . . .

However, Respondent testified on cross-examination that Ms. Boyd had purchased the airline tickets herself. Respondent drew another check on his attorney trust account made payable to Gardner Law Group in the amount of $2,845.00 on July 19, 2010.... Respondent spent between two and three hours with the group during their trip....

After Ms. Boyd realized Respondent would not be able to help her and AG, she emailed Respondent about returning the remaining $20,500 out of the money that was supposed to go to Rick Ross. Aaron Garner also attempted to contact Respondent numerous times about returning the money. He called Respondent approximately thirty (30) times between July and September 2010, but Respondent did not answer the calls. Respondent finally answered one of Garner's calls and told him he could not return the money until Blue Williams returned the $12,500.00 to him. Respondent eventually returned $4,500.00 to Ms. Boyd on July 26, 2010.... According to his ledger, this left a balance of $2,087.50 in the trust account. Respondent did not return the money to his clients, and could not explain what happened to those funds.... The disbursement of $2,845.00 [to Respondent] made on July 19, 2010 is listed on the ledger for [against the original]$5,000.00 retainer and also listed as being deducted from the $25,000.00 payment according to an email from Rosalind Tyner to Ms. Boyd dated July 26, 2010....

.... When Respondent did not return the money to Ms. Boyd, [her] investors foreclosed on her home, her house was taken away, and she died of cancer shortly thereafter. Christopher 'AG' Holden is now detailing cars trying to get his music career back on track."

■ Respondent took several exceptions to the various factual findings regarding this portion of the Boyd matter. As we stated above in *Zimmerman*, 428 Md. at 134, 50 A.3d at 1214 and *London*, 427 Md. at 343, 47 A.3d at 995 "... deference [to the hearing judge's findings of fact] is appropriate because the hearing judge is in a position to assess the demeanor-based credibility of the witnesses." While there

were certain conflicts in the testimony between Petitioner's witnesses and Mr. Gardner, there was more than sufficient clear and convincing evidence to support Judge Hong's findings in the Boyd matter.

Accordingly, Respondent's exceptions are overruled.

## CONCLUSIONS IN RESPECT TO BAR COUNSEL'S COMPLAINT

Judge Hong reached the following conclusions of law in respect to Respondent's conduct in the matters contained in Bar Counsel's Complaint:

■ She found "by clear and convincing evidence" that Respondent failed to hold client funds in a separate account and failed to maintain records as required by Title 16 of the Maryland Rules and accordingly had violated the provisions of Rule 1.15(a) in respect to the PIP check relating to Mr. Gordon. Respondent does not except to this conclusion nor to the findings of fact supporting the conclusion. Maryland Rule 16–759(b) **Review by Court of Appeals** provides, in relevant part, "If no exceptions are filed [in respect to findings of fact], the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any." Upon our de novo review of the evidence presented, we find it to be clear and convincing, and we, thus, determine that Judge Hong did not err. We agree with the hearing judge that Respondent violated the provisions of Rule 1.15(a).

■ She next concluded by clear and convincing evidence that Respondent had violated the provisions of Rule 5.4(a) in writing the four checks from the trust account to Ms. Tyner. Respondent does not except to this conclusion nor to the findings of fact that support the conclusion. Upon our de novo review of the evidence presented, we find it to be clear and convincing. The hearing judge did not err in concluding that Respondent violated the provisions of Rule 5.4(a).

The hearing judge, based upon her findings of fact, concluded that Respondent had violated Rule 8.4(a) by violating the

requirements of Rule 1.15(a) (the Gordon matter) and the provisions of 5.4(a) (the improper sharing of fees with Ms. Tyner). Respondent did not except to this conclusion of law by Judge Hong nor to the findings of fact supporting that conclusion. Upon our de novo review of the evidence, we find it to be clear and convincing, and, thus, we agree with Judge Hong that Respondent violated Rule 8.4(a). The hearing judge did not err.

■ Judge Hong concluded, based upon her findings of fact, that Respondent had violated the provisions of 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation in respect to the Gordon matter. She quoted from our case of *Attorney Grievance Commission v. Herman,* 380 Md. 378, 400, 844 A.2d 1181, 1195 (2004) that " 'Absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty.' " Respondent took no exception to this conclusion nor to the findings of fact supporting it. Upon our de novo review of the evidence, we find it to be clear and convincing, and, thus, we agree with the hearing judge that Respondent has violated the provisions of Rule 8.4(c).

■ She concluded, based upon her findings of fact, that Respondent had violated the provisions of Maryland Rule 16–606.1(a) that requires a lawyer to create and maintain records for all attorney trust accounts. She concluded that Respondent admitted to violations of this Rule, but that he blamed it on "sloppy accounting practices." She asserted that a violation of this rule was further proven by the fact that Respondent had allowed a check drawn on his trust account to bounce. Respondent took no exception to this conclusion of law nor to the supporting facts. Upon our de novo review of the evidence, we find it to be clear, convincing and supportive of the findings of fact and the hearing judge's conclusions based upon those findings, and, thus, we agree with Judge Hong's conclusion. She also held that he failed to reconcile his attorney trust account on a monthly basis and thus violated the provisions of Maryland Rule 16–606.1(b). Respondent

took no exception to this conclusion of law. Upon our review of the evidence and the findings, we agree with Judge Hong that Respondent violated these rules.

Judge Hong concluded that Respondent had made or authorized cash withdrawals from his trust account and, by issuing a check for $2,500.00 to Leonard Siegel, had permitted his trust account to have a negative balance of -$922.17. The hearing judge concluded that such actions violated the provisions of Maryland Rule 16–609. We have reviewed the testimony, exhibits and other evidence on a de novo basis and we conclude that by the clear and convincing evidence standard applicable on these types of cases, Judge Hong's conclusion was correct. Respondent also violated this rule.

### *CONCLUSIONS IN RESPECT TO STEVE KANG'S COMPLAINT*

■ The hearing judge noted that the Respondent "did not possess the requisite knowledge or even a basic level of competence necessary to handle the immigration matter for which he was retained." She also concluded that he never refiled the immigration application. She also concluded that Respondent generated incomprehensible billing statements and demonstrated an absence of knowledge, skill, thoroughness and preparation in the area of billing practices and did not regularly bill Mr. Kang. She concluded that even after four meetings with Mr. Kang, Respondent admitted that his billings still contained inaccuracies. For all of these reasons, Judge Hong concluded that Respondent had violated the provisions of Rule 1.1. Respondent took exception to the hearing judge's conclusion of law on this issue. We have reviewed de novo the evidence, especially the transcripts of testimony in this matter, and the Court also concludes that there was credible, clear and convincing evidence supporting Judge Hong's determination that Respondent violated Rule 1.1. Respondent's exception to this conclusion is overruled.

■ In her conclusions of law, Judge Hong then addressed Rule 1.3 noting that it states "A lawyer shall act with reason-

able diligence and promptness in representing a client." She concluded that Respondent's deficiencies in this area constituted a violation of Rule 1.3, stating in summary:

"Respondent failed to act in a prompt and diligent manner by waiting three months to contact Mr. Kang about the information he needed to complete the visa application and by not timely refiling Jin Shifeng's (Ms. Li's husband) visa application. Respondent also never took further action after filing for the mechanic's lien against Dujamae, and the end result was dismissal for lack of prosecution."

Respondent excepted to this conclusion of law by the hearing judge. After our de novo review of the evidence we conclude that this violation is established. Judge Hong did not err. Respondent's exception(s) are overruled.

In respect to Rules 1.4(a)(1), 1.4(a)(2) and 1.4(b), the trial court concluded, that as a matter of law, Respondent had violated these rule provisions. After a more extensive discussion, she concluded: "Respondent did not adequately communicate to Mr. Kang what he was doing with his various cases and the status of each. He did not provide Mr. Kang with enough information to make informed decisions about his legal matters, and did not seek informed consent when required." Respondent took exception to this conclusion, stating: ". . . . Respondent introduced sufficient evidence that he communicated with Mr. Kang via email, fax, mail, and in person regarding the matters he was asked to handle."

However, there was sufficient clear and convincing evidence to the contrary. The hearing judge has the primary role in assessing the credibility of the witnesses. She chose to credit Mr. Kang's testimony over that of Respondent. That is one of a trial judge's functions in these types of matters. We have reviewed the evidence presented and hold that Judge Hong was not erroneous in making this proposed conclusion of law. Respondent's exception is overruled.

The hearing judge also held that Respondent violated the provisions of Rule 1.5 as to the reasonableness of his fees.

In her conclusion, she listed the required factors for her to consider in assessing whether this particular rule had been violated. After a short discussion of some of the factors and how they applied (or did not apply), she stated:

" . . . . The factor that most clearly applies in this case is the amount of the fee charged and Respondent's failure to obtain meaningful results on behalf of M. Kang.

. . . . While the $250.00 per hour is not facially excessive, Respondent's failure to follow through on [m]any of Mr. Kang's legal matters make the fees charged unreasonable. The only matter that was successfully handled was the Federal Liquors liquor license transfer, and Jean Fugett completed most of the work on that case. For those reasons, this Court finds by clear and convincing evidence that Respondent violated Rule 1.5(a).

Rule 1.5(b) also mandates that the basis of the fee must be communicated to the client prior to, or within a reasonable time after, the onset of representation. . . . Respondent did not communicate the scope of the representation or the basis for his fee for each of Mr. Kang's distinguishable legal matters."

Upon our independent review of the testimony and the record in this case, we agree with Judge Hong. There was sufficient evidence to support her conclusion. She did not err. Respondent's exception to this conclusion is overruled.

■ In the matter relating to Mr. Kang and potential conflicts of interest, Judge Hong also concluded that Respondent had violated the provisions of Rule 1.7. She stated in relevant part:

"Respondent claims that he did not violate this rule because Mrs. Li was never his client. . . .

The representation of both Mr. Kang and Mrs. Li necessarily involved the same subject matter—the business of bringing a branch of the Yanbian Company and its officers to the United States. . . . Gary Maslin, counsel for Mrs. Li, put Respondent on notice of the potential conflict twenty (20) months before the trial. . . . He [Respondent] entered

his appearance in the lawsuit [on behalf of Mr. Kang], and only withdrew his appearance after Mrs. Li's attorney filed a motion to strike his [Respondent's] appearance.... Respondent thus engaged in representation where there was a significant risk that he would have been materially limited by representation of a former client."

We agree with the hearing judge that the clear and convincing evidence in this record supports her conclusion that Respondent had a conflict of interest, was advised that he had a potential conflict of interest, and did not withdraw his appearance until, on the eve of the trial, a motion was made to strike his appearance. Respondent's conduct violated Rule 1.7. Judge Hong did not err. Respondent's exception as to this conclusion is overruled.

The judge then concluded that Respondent had violated Rule 1.16 because he "did not accurately account for all of Mr. Kang's fee payments and did not refund any of the fees collected. Furthermore, Respondent acknowledged that after four revisions, his invoices were still not accurate." Respondent took no exception to this conclusion, and we hold that Judge Hong did not err and hold that Respondent violated Rule 1.16.

In respect to the matter concerning Mr. Kang, Judge Hong found that the Respondent violated Rule 8.4(a) by violating the Maryland Rules of Professional Conduct and based this conclusion on her other conclusions that he had violated the rules above mentioned. She then noted that "An attorney violates Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Once again '[a]bsent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty. Respondent's numerous billing errors and failure to account for all of Mr. Kang's fee payments cause this Court to find .... that Respondent acted deceitfully and dishonestly in violation of Rule 8.4(c)." Respondent took no exception to this conclusion, and we agree with the hearing judge that Respondent violated the provisions of Rule 8.4(c) in the Kang matter.

Finally, our hearing judge found that Respondent violated Rule 8.4(d) because he took no action when he was notified that Mr. Kang's mechanic's lien action was facing dismissal for lack of prosecution. Respondent took an exception to this issue, stating "... Respondent offered to pursue the matter for an additional retainer fee; however Mr. Kang could not provide the money to pursue the matter." However, Mr. Kang testified that he did not even know of the filing of the mechanic's lien action until he had hired a new attorney, and the new attorney told him it had been filed. Obviously, the hearing judge assessed the credibility of Mr. Kang and the Respondent in concluding that Respondent had violated this rule. Respondent's exception on this issue is insufficiently supported by the credible evidence in the record. The record adequately supports the conclusions of our hearing judge and we hold that she made no error. We also hold that Respondent violated the provisions of Rule 8.4(d).

### CONCLUSIONS IN RESPECT TO THE BOYD MATTER

Judge Hong noted that attorneys violate Rule 1.1 "when they fail to handle a client matter with 'lawyerly skill and ability.'" She then concluded that Respondent failed to provide competent representation during the course of his representation of Ms. Boyd and "AG." She concluded that he made significant payments to Blue Williams and Mahogany Jones without adequately protecting the interests of Ms. Boyd and "AG". Judge Hong concluded, "He made these payments to Mr. Williams and Mrs. Jones on behalf of his clients, but failed to act competently by not ensuring that contracts were executed before the funds were transferred." The record and the findings of fact contained therein, sufficiently support the conclusion of the hearing judge. She did not err. We hold that Respondent violated Rule 1.1 in his representation of Ms. Boyd and/or "AG."

The hearing judge noted that Rule 1.4(a)(2) requires lawyers to keep their clients informed in a reasonable manner. After citing *Attorney Grievance Commission v. Kreamer*, 404

Md. 282, 946 A.2d 500 (2008), Judge Hong concluded: "The only difference between the case at bar and *Kreamer* is that the Respondent in this case was representing his clients in an 'entertainment matter.'" She concluded that he was unable to respond to his client's requests for information or declined to do so. She then said: "His failure to communicate with his client for over two months without reason causes this Court to find by clear and convincing evidence that Respondent violated Rule 1.4(a)(2). Furthermore, this Court finds by clear and convincing evidence that Respondent violated Rule 1.4(a)(2) by not timely disclosing the $1,000.00 payment to Mr. Williams." Respondent excepted, saying, "Respondent put forth evidence demonstrating that he kept in contact with Ms. Boyd in his attempts to track down Zane and Mr. Williams for the return of her funds." The evidence before the hearing judge indicated that there were numerous (30) unanswered communications from the Boyd interests in reference to the Respondent as to the moneys at issue without an adequate response. We agree with the hearing judge. Respondent's exceptions to portions of the hearing judge's conclusions are overruled.

She next addressed Rule 1.4(b), concluding: "Respondent should have advised that he intended to make a cash payment to Mr. Williams [of $12,000.00], and that a danger existed in disbursing the funds to Mr. Williams without the existence of a contract. He should also have warned his clients about the potential danger in giving a $2,500.00 payment to Mahogany Jones for the Essence Music Festival without a signed contract...." Judge Hong concluded that Respondent violated the provisions of Rule 1.4(b). Respondent took an exception to the conclusion concerning the $12,000.00 payment to Mr. Williams, saying, "Respondent and Mr. Garner both testified about the rushed nature of the matter, and Respondent testified and put forth evidence that Ms. Boyd instructed Respondent to make a deposit without a contract being in place, against the advice of Respondent." He took no exception in respect to the conclusion as to the Mahogany Jones' payment. In any event, the exception made is overruled. Judge Hong's conclusion is amply supported by

clear, convincing and credible evidence. We hold that Respondent violated Rule 1.4(b).

The hearing judge concluded that Respondent violated Rule 1.5 which, as before stated, prohibits unreasonable fees. Petitioner, in presenting this alleged rule violation, based it on the fact that Respondent billed his general fee rate for performing non-legal services such as escorting his clients to Washington D.C. and on the fact that the total amount of fees charged for the matters relating to Boyd and AG were unreasonable. Respondent argued to Judge Hong that it was reasonable to charge his regular fee for non-legal work because the time he spent with the client on non-legal matters took away the time he could have been working on other legal matters. Gardner also argued that the charges he made were "reasonable . . . and customary in the [entertainment] industry." [18]

Judge Hong found Respondent's position that he could bill for non-legal services because those services compromised the time he could expend on legal matters, could, under some circumstances, be permitted but, quoting from *Attorney Grievance Commission v. Wright*, 306 Md. 93, 104, 507 A.2d 618, 623 (1986), noted that such charges could only be made when there is " 'some kind of effective disclosure to the client as part of the terms of the engagement.' " She concluded that "Respondent never made any such disclosure to his clients, and billed ten hours when he spent at most three hours with them. This fee was unreasonable. . . . Accordingly, this Court finds by clear and convincing evidence that Respondent violated Rule 1.5." As to this conclusion, Respondent took no exceptions. Judge Hong did not err. We hold that Respondent again violated Rule 1.5.

---

**18.** Other than his own speculation, there was no evidence presented at the hearing that the fees charged were "customary" in the entertainment industry. No experts, no laymen, no entertainers, no one in the industry testified.

Under the provisions of Rule 1.5(a), attorneys must hold their client funds in a separate trust account and create and maintain proper accounts. Judge Hong concluded that:

"Respondent only performed 2.00 hours of billable work [in respect to the retainer of $5,000.00] on behalf of Ms. Boyd and AG. Thus he should have been holding $4,500.00 in his trust account, but the balance of the trust account at the end of February 2010 was $98.38. He also used funds from his trust account to pay a Verizon bill on February 22, 2010. Finally, he made a $1,000.00 disbursement to Mr. Williams [in addition to the $12,000.00 cash disbursement previously made from the $25,000.00 forwarded to him and placed in his trust account in respect to the Rick Ross matter] after the end of representation without telling his clients, and did not note it on the retainer ledger until December 10, 2010. For these reasons this Court finds by clear and convincing evidence that Respondent violated Rule 1.5(a)."

We agree with the hearing judge. Respondent violated the provisions of Rule 1.5(a). Respondent filed no exceptions to this conclusion.

Judge Hong next concluded that Respondent violated the provisions of Rule 1.16(d) because he did not take reasonable steps to protect Ms. Boyd and AG's interests. She concluded that he also failed to return the unearned portion of the trust balance and also concluded that he billed for work that was done after the termination of his representation. Judge Hong did not err. Respondent did not except to these conclusions. We hold that Respondent violated the provisions of Rule 1.16(d).

Then the hearing judge concluded once again, by clear and convincing evidence, that Respondent, in the Boyd/AG matter, had violated the provisions of Rule 8.4(a) by committing the numerous other violations of the rules in the representation of these clients. She reiterated her prior conclusions in this particular matter, then stated: "Finally, no explanation was given as to why Respondent wrote another $1,000.00 check to Mr. Williams. Respondent also double billed his clients when

he deducted $2,845.00 from both the initial $5,000.00 retainer and the $25,000.00 payment." No exception was taken in respect to this conclusion of the hearing judge. We hold that she committed no error and further hold that Respondent again violated the provisions of Rule 8.4(a).

Judge Hong found that Respondent did not maintain accurate client matter records for either the $5,000.00 retainer or the $25,000.00 trust deposit. She concluded that he violated Maryland Rule 16–606.1(a) by reason of his failure to maintain said records. Respondent took no exception to this conclusion. We agree with the hearing judge, and hold that Respondent violated the provisions of the Maryland Rule 16–606.1(a).

In her final conclusion, Judge Hong determined that Respondent violated the provisions of Maryland Rule 16–609 stating:

"Maryland Rule 16–609 prohibits an attorney from making cash withdrawals from a trust account. Respondent made seven (7) cash withdrawals [in addition to the $12,500 cash withdrawal he delivered to Blue Williams] in February 2010 totaling $3,650.00. Thus, [this] Court finds by clear and convincing evidence that Respondent violated Maryland Rule 16–609."

Mr. Gardner took no exception to this final conclusion of our hearing judge. We agree with her and conclude that he violated the provisions of Maryland Rule 16–609.

## MITIGATING AND AGGRAVATING FACTORS

There are no credible mitigating factors.

An aggravating factor is that Respondent has been previously subject to disciplinary consideration and was, about the time that he was committing some of the present violations of the rules, or just prior thereto, actually participating, or had just participated, in a Conditional Diversionary Agreement with the Attorney Grievance Commission. That agreement included him attending a session on the financial management of a law firm. He learned little, if anything, apparently, about financial management from that session. Additionally, Re-

spondent's conduct resulted in prejudice to his various clients. His conduct during the progress of this disciplinary proceeding also is an aggravating factor. He failed to show up for a deposition and was sanctioned as result. Additionally, he was continually late in appearing at the hearings before Judge Hong.

## SANCTION

As the Court has often stated, the purpose of imposing sanctions is to protect the public. *Att'y Grievance Comm'n v. Zimmerman*, 428 Md. at 144, 50 A.3d at 1220 (2012), ("This Court sanctions attorneys to protect the public and the public's confidence in the legal profession."); *Att'y Grievance Comm'n v. Dominguez*, 427 Md. 308, 327, 47 A.3d 975, 986 (2012), *Att'y Grievance Comm'n v. Seltzer*, 424 Md. 94, 116, 34 A.3d 498 (2011).

In *Zimmerman*, 428 Md. at 144, 50 A.3d at 1220, Judge Adkins, for the Court, recently opined:

We have held that "[m]isappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Att'y Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 410, 773 A.2d 463, 483, 488 (2001) (citations omitted) (attorney disbarred). In *Agiliga*, we disbarred an attorney for the previously cited misuse of and failure to preserve client funds. *See [Att'y Grievance Comm'n v.] Agiliga*, 422 Md. [613] 624, 31 A.3d [103,] 109–10 [ (2011 )]. Misappropriation and misuse of client funds has warranted disbarment in numerous other cases.

Respondent has been found to have violated Rule 1.15(a), Rule 5.4(a), Rule 1.1 (two violations), Rule 1.3, Rule 1.4(a)(1), Rule 1.4(a)(2) (two violations), Rule 1.4(b) (two violations), Rule 1.5(a) (two violations), Rule 1.5(b), Rule 1.7(a), Rule 1.16 (two violations), 8.4(a) (three violations), Rule 8.4(c) (three violations), 8.4(d), Maryland Rule 16.606(a) (two violations), Maryland Rule 16–606(b), Maryland Rule 16–609 (2 violations).

We shall not address any further the specific rule violations. Looked at in isolation some violations are so serious in and of themselves that they warrant a severe sanction. In the scope and number of the violations, they are particularly egregious. Some of them address serious mishandling of client's funds. Some concern the misappropriation of those funds, withdrawing cash from trust funds (in one case carrying the sum of $12,500 to New York and giving it to his friend, "Blue" Williams) improper billing, improper trust records, conflicts of interest and much more.

Consistent with our duty in such cases, and as Judge Adkins said in *Zimmerman*, 428 Md. at 146, 50 A.3d at 1221, quoting from our case of *Attorney Grievance Commission v. Stern*, 419 Md. 525, 558, 19 A.3d 904, 926 (2011):

> "It has long been settled that an attorney's misappropriation of funds entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct. The default sanction for ethical violations involving intentional misappropriation, or other intentional dishonest conduct is disbarment. . . ."

The sanction in this case is disbarment.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST PAUL WINSTON GARDNER, II.**